IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WYNDHAM RESORT DEVELOPMENT CORPORATION and WYNDHAM VACATION RESORTS, INC., | ) ) ) ) | 2:10-cv-01556-GEB-KJM |
| Plaintiffs, | ) ) | **TENTATIVE RULING** GRANTING PLAINTIFFS' MOTION FOR A |
| v. | ) ) | PRELIMINARY INJUNCTION |
| ROBERT BINGHAM, | ) ) | |
| Defendant. | ) ) | |

        The following is a tentative ruling on Plaintiffs' motion for a preliminary injunction prepared in anticipation of the hearing scheduled to commence at 1:30 p.m. on July 8, 2010.

        Plaintiffs Wyndham Resort Development Corporation ("WRDC") and Wyndham Vacation Resorts, Inc. ("WVR") (collectively, "Wyndham") filed a motion for a temporary restraining order ("TRO") on June 22, 2010, seeking to enjoin Defendant Robert Bingham from "disclosing or using any and all trade secret, proprietary or confidential information belonging to Wyndham[,] . . . including but not limited to all lists, of, and information pertaining to, Wyndham's customers, owners or members." (Not. of Mot. for TRO 1:25-2:2.)  On June 22, 2010, a briefing schedule issued and a hearing was set for June 28, 2010 at 1:30 p.m.  However, after Bingham failed to file any response, the hearing was vacated, Plaintiffs' motion for a TRO was granted, and

a hearing and briefing schedule on Plaintiffs' request for a preliminary injunction issued.[1]  Defendant was required to file an opposition no later than June 30, 2010 at 4:30 p.m.  However, Defendant again did not file any response.  Nonetheless, a hearing was held on July 8, 2010.  For the reasons stated below, Plaintiffs' motion for a preliminary injunction is GRANTED.

## I.    LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the relative positions of the parties - the status quo - until a trial on the merits can be conducted. LGS Architects, Inc. v. Concordia Homes of Nev., 434 F.3d 1150, 1158 (9th Cir. 2006) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  A plaintiff seeking a preliminary injunction must establish that he is (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "a preliminary injunction is in the public interest." Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing Winter v. Natural Res. Def. Council, Inc., --- U.S. ----, ----, 129 S. Ct. 365, 374, 172 L.Ed 2.d 249 (2008)); see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) (adopting the preliminary injunction standard articulated in Winter).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 129 S. Ct. at 376.  "If a plaintiff

---

[1] Plaintiffs' motion appears to seek only a TRO. However, the proposed order filed by Plaintiffs requested that a hearing be set to hear their motion for a preliminary injunction yet did not provide that Plaintiffs would file an additional brief. Accordingly, Plaintiffs' motion for a TRO is construed as also seeking preliminary injunctive relief.

2

fails to meet its burden on any of the four requirements for injunctive relief, its request must be denied." <u>Sierra Forest Legacy v. Rey</u>, --- F. Supp. 2d ----, 2010 WL 715846, at *1 (E.D. Cal. 2010) (citing <u>Winter</u>, 129 S. Ct. at 376). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." <u>Indep. Living Ctr. of S. Cal. Inc. v. Maxwell-Jolly</u>, 572 F.3d 644, 651 (9th Cir. 2009) (quoting <u>Winter</u> 129 S. Ct. at 376).

## II.  BACKGROUND

### A.  Factual Background

Plaintiff WVR develops, finances, manages and sells timeshare properties. (Compl. ¶ 7.) WVR's sister company, Plaintiff WRDC, is the exclusive developer, marketer and management company of WorldMark The Club ("WorldMark"). (Fry Decl. ¶ 3.) Peggy Fry, the Vice President of Owner Services for WRDC, describes WorldMark as follows:

> WorldMark is a credit-based timeshare product that allows the owner to vacation within the WorldMark system of resorts. WRDC does not sell deeded interests in property at a specific resort. Instead, WorldMark owners own points called "vacation credits" that they can use at 70 WorldMark resorts in the United States, Hawaii, Canada, Mexico and Fiji. The timeshare owners purchase an initial quantity of credits and in return they obtain a WorldMark The Club membership. Each year the WorldMark owners receive their annual allocation of credits. WorldMark owners have the opportunity to upgrade their memberships by purchasing additional credits. By upgrading their memberships, WorldMark owners increase their annual allotment of credits which provides them with more access to the WorldMark resorts.

(Fry Decl. ¶ 3.)

WRDC has two sales forces. (Peterson Decl. ¶ 3.) "The 'frontline' sales force sells WorldMark memberships to prospects that

1  are not current WorldMark members.  The 'upgrade' sales force sells
2  upgrades to existing WorldMark members."  (Id.)  "The upgrades sales
3  force directly competes with third-party brokers for upgrade sales.
4  Third-party brokers seek to sell discounted upgrades to current
5  WorldMark members."  (Id. ¶ 5.)  The majority of WRDC's sales revenue
6  is generated from upgrade sales.  (Id. ¶ 4.)  In 2009, WorldMark
7  members purchased 13,257 upgrades from WRDC, accounting for
8  approximately 61 percent of WRDC's total sales for that year.  (Id. ¶
9  9.)

10         Bingham was employed by WRDC on four occasions from 1994 to
11 2009 and held various positions including sales representative, sales
12 manager, and director of site sales.  (Haskew Decl. ¶ 3.)  Most
13 recently, Bingham was employed from February 2009 until August 14,
14 2009 as a sales representative.  (Id.)  In this capacity, Bingham was
15 responsible for selling upgrades to existing WorldMark members.  (Id.
16 ¶ 4.)  Bingham's employment with Wyndham, however, was terminated on
17 August 16, 2009.  (Id. ¶ 9.)

18         On April 15, 2010, Peggy Fry received an email from Dan
19 Murphy, the President of Timeshare Liquidation Service, LLC, in which
20 he wrote that "'a past Wyndham sales executive' tried to sell him
21 40,000 names of WorldMark owners."  (Fry Decl. ¶ 6.)  Fry requested
22 that Murphy tell her the name of the former sales executive;
23 initially, Murphy declined to reveal the former sales executive's
24 identity.  (Id. ¶ 7.)  Fry contacted Murphy on June 1, 2010, again
25 requesting that he disclose the name of the former sales executive.
26 (Id. ¶ 8.)  Murphy responded in an email, writing that he:
27         was offered 40,000 [WorldMark] owners['] names,
           prequalified for Travel Share, from the N. CA
28         office, by [WorldMark] Owner Robert Bingham,

4

>  formerly owner of WM 00023005104.  He claimed to have worked for Trendwest/Wyndham for 17 years.  I declined, stating that [those] names belonged to Wyndham, not Bingham.  He concurred, and didn't press me.  I have no idea if he was successful selling them elsewhere, or if he even has them to begin with.

(Fry Decl. ¶ 6, Ex. A.)

Prior to commencing his employment with Wyndham, Bingham agreed in writing to abide by the Business Principles of WRDC's parent Company, Wyndham Worldwide Corporation.  (Haskew Decl. ¶ 8.)  Wyndham Worldwide Corporation's Business Principles identify "client lists, (including phone numbers and postal and e-mail addresses) and/or client or customer contact information" as "confidential and proprietary information" that is the "sole property of Wyndham Worldwide."  (Haskew Decl. ¶ 8, Ex. C at 12.)  The Business Principles further provide that "[i]information relating to the company and its subsidiaries and affiliates must be kept secure, used solely as authorized by the Company and must not be given to unauthorized outsiders or used for personal interest or profit."  (Id. at 13.)

Prior to beginning his employment with WRDC, Plaintiff also signed a Salesperson Agreement on February 11, 2009 which states the following:

>  DISCLOSURE OF INFORMATION.  Salesperson agrees and acknowledges that, as an employee of WRDC, Salesperson may be given or be privy to certain valuable, proprietary or confidential information, including but not limited to . . . prospect or purchaser lists.  Except in the normal course of Salesperson's duties hereunder, Salesperson shall not, while employed by WRDC or at anytime thereafter, copy or disclose any such information to any person or entity for any reason or purpose, nor shall Salesperson utilize such information.  Salesperson agrees that all such information, including any copies thereof, is the property of WRDC and that immediately upon termination of

5

> Salesperson's employment with WRDC all such property and data, including any copies, recordations (whether in written or electronic form) or abstracts thereof, shall be returned to WRDC. Because WRDC's damages from any violation of this paragraph would be impracticable and extremely difficult to determine, the liquidated amount of damages presumed to be sustained from any such breach will be $15,000. That sum is agreed on as compensation for the injury suffered by WRDC, and not as a penalty. In addition, WRDC shall be entitled to injunctive relief as well as any remedy available at law, including reasonable attorney's fees incurred in obtaining such relief.

(Haskew Decl. ¶¶ 7-8, Ex. A. ¶ 6.)

Further, upon his termination, Bingham was provided with a severance agreement entitled "Agreement and General Release." (Id. ¶ 11.) Paragraph 13 of the Agreement and General Release states:

> BINGHAM acknowledges that in connection with his/her employment, BINGHAM has had access to information of a nature not generally disclosed to the public. BINGHAM agrees to keep confidential and not disclose to anyone, unless legally compelled to do so, Confidential and Proprietary Information. "Confidential and Proprietary Information" includes but is not limited to all Company or any Released Party's . . . current and prospective client and supplier lists . . . . Such confidential information may or may not be designated as confidential or proprietary and may be oral, written or electronic media. BINGHAM understands that such information is owned and shall continue to be owned by the Released Parties. BINGHAM agrees that he/she has not and will not disclose, directly or indirectly, in whole or in part, any of the Confidential and Proprietary information. BINGHAM acknowledges that he/she has complied and will continue to comply with this commitment, both as an employee and after the termination of his/her employment. BINGHAM also acknowledges his/her continuing obligations under the Company Business Principles.

(Haskew Decl. ¶ 12, Ex. D.) Plaintiff executed the Agreement and General Release on April 16, 2010, approximately eight months after his termination.

Dana Peterson, the Vice President of Upgrade Sales for Wyndham Vacation Ownership, Inc. declares that "[t]he names and contact information of WorldMark members is not publicly-available because a WorldMark membership is not a deeded interest in a timeshare." (Peterson Decl. ¶ 5.) Peterson further avers that "WRDC spends a significant amount of time and resources developing and maintaining its membership base" and that "WRDC's member lists are trade secret and confidential and proprietary information [since they] . . . provide WRDC with competitive advantages, or the opportunity to gain competitive advantages, over those who do not have access to this information." (Id. ¶¶ 6-7.)

### B.  Procedural History

Plaintiffs filed a complaint against Bingham in this federal court on June 21, 2010, alleging claims of trade secret misappropriation, unfair competition under California Business and Professions Code section 17200, breach of contract and intentional interference with prospective economic advantage. Plaintiffs moved for a TRO on June 22, 2010.

### III.  DISCUSSION

### A.  Likelihood of Success on the Merits

Plaintiffs argue they are likely to succeed on the merits of each of their four claims alleged against Bingham.

**i)  Trade Secret Misappropriation Claim**

Plaintiffs argue "Bingham's actions . . . constitute misappropriation of Wyndham's trade secrets, specifically its list of 40,000 WorldMark owners." Plaintiffs further argue that "[d]espite having agreed on three separate occasions to maintain the confidentiality of Wyndham's member information, Bingham offered to

7

provide the list to a competitor, Timeshare Liquidation Service, LLC, which could have used that information to directly compete against Wyndham in marketing upgrades to Wyndham's members." (Mem. in P. & A. in Supp. of Mot. for TRO 7:25-8:4.)

California has adopted the Uniform Trade Secrets Act ("UTSA"). MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 520 (9th Cir. 1993) cert. denied, 510 U.S. 1033 (1993). To prevail on their trade secret misappropriation claim, Plaintiffs must satisfy "two primary elements": "(1) the existence of a trade secret, and (2) misappropriation of the trade secret." AccuImage Diagnostics Corp. v. Terarecon, Inc., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (citing Cal. Civ. Code § 3426.1(b)).

    **a. Trade Secret**

The UTSA defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that . . . [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and . . . [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

"It is well-established that a customer list may constitute a protectable trade secret." Gable-Leigh, Inc. v. N. Am. Miss, No. CV 01-01019 MMM (SHX), 2001 WL 521695, at *15 (C.D. Cal. Apr. 13, 2001) (citations omitted); see also Robert Half Int'l, Inc. v. Murray, No. CV F 07-0799 LJO SMS, 2008 WL 2625857, at *4 (E.D. Cal. June 25, 2008) (stating "[a] customer list acquired by lengthy and expensive efforts deserves protection as a trade secret") (citing MAI Systems, 991 F.2d at 521 & Courtesy Temporary Serv., Inc. v. Camacho, 222 Cal. App. 3d

1278, 1288 (1990)). In <u>Morlife, Inc. v. Perry</u>, 56 Cal. App. 4th 1514, 1521-22 (1997), the California Appellate Court explained the circumstances under which a customer list is entitled to trade secret protection under the UTSA:

> [C]ourts are reluctant to protect customer lists to the extent they embody information which is "readily available" through public sources, such as business directories. On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify th entities as potential customers. As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret. The requirement that a customer list must have economic value to qualify as a trade secret has been interpreted to mean that the secrecy of this information provides a business with a "substantial business advantage." In this respect, a customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested. Its use enables the former employee to "solicit both more selectively and more effectively."

(internal citations omitted).

Plaintiffs have provided evidence that the identifies and contact information of WorldMark members is not publicly available and that their customer list has economic value "because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness" to purchase upgrades. <u>Morlife</u>, 56 Cal. App. 4th at 1522 (citation omitted); (Peterson Decl. ¶¶ 5-7.) Further, Plaintiffs have shown that they took measures reasonable under the circumstances to maintain the secrecy of their

9

customer lists by requiring that sales staff undergo training as well as sign multiple agreements in which they acknowledge that WRDC's client lists and customer contact information are considered confidential and proprietary and the property of WRDC. (Id. ¶ 8.) Plaintiffs, therefore, have shown that they are likely to succeed in establishing that their customer list constitutes a protectable trade secret under the UTSA.

### b. Misappropriation

The UTSA defines "misappropriation" as:

> Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (A) Used improper means to acquire knowledge of the trade secret; or
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>   (i) Derived from or through a person who had utilized improper means to acquire it;
>   (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use; or
>   (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (C) Before a material change of his or her position knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b). "Actual or threatened misappropriation may be enjoined." Cal. Civ. Code § 3426.2(a); see also Cent. Valley Gen. Hosp. v. Smith, 162 Cal. App. 4th 501, 524 (2008) (interpreting California Civil Code section 3426.2(a) as providing "that an injunction may be based either on actual misappropriation or on threatened misappropriation").

1 Undoubtedly, Bingham's alleged attempt to sell Plaintiffs'
2 customer list to one of Plaintiffs' competitors constitutes threatened
3 misappropriation under the UTSA.  Plaintiffs, therefore, have shown
4 that they are likely to prevail on their claim that Bingham threatened
5 to misappropriate their trade secret.

6 Since Plaintiffs have shown a likelihood of success on their
7 trade secret misappropriation claim, their likelihood of success on
8 their other three claims need not be analyzed.

### B. Likelihood of Irreparable Harm

10 Plaintiffs also argue they will suffer irreparable harm if
11 Bingham is not restrained from disclosing their customer list.
12 Specifically, Plaintiffs argue that "Bingham's actions directly
13 threaten Wyndham with the loss of upgrade sales" as well as the
14 "ero[sion] [of] the good will between WRDC and its members." (Mem. of
15 P. & A in Supp. of Mot. for TRO 10:13-14, 22-25.)

16 Peggy Fry declares that "[a] large percentage of WRDC's
17 business is repeat business from WorldMark owners, including existing
18 owners' purchase of updgrade and owner referrals [and,] [t]herefore[,]
19 owner relations and goodwill are vital to WRDC's success." (Fry Decl.
20 ¶ 5.)  Fry further declares that WorldMark members "expect WRDC to
21 keep [their WorldMark membership] . . . confidential" and "[a]ny
22 disclosure of the names and contact information of WorldMark owners to
23 third-party brokers adversely affects the good will and trust of
24 WorldMark owners and consequently hurts WRDC's sales." (Id.)  Lastly,
25 Fry declares that "[i]n recent months, the Owner Care department has
26 received an increasing number of complaints from WorldMark owners
27 regarding the owners being solicited by third-party timeshare
28 brokers." (Id.)

1  Plaintiffs, therefore, have shown that they are likely to
2 suffer irreparable harm in the absence of injunctive relief.  See
3 Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., Inc., 240 F.3d
4 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective
5 customers or goodwill . . . supports a finding of the possibility of
6 irreparable harm."); see also Gallagher Benefit Servs., Inc. v. De La
7 Torre, 283 Fed. Appx. 543, 546 (9th Cir. Jun. 24, 2008) (affirming
8 district court's conclusion that injury to goodwill and customers due
9 to trade secret misappropriation constitutes irreparable harm); TMX
10 Funding, Inc. v. Impero Techs., Inc., No. C. 10-00202 JF (PVT), 2010
11 WL 1028254, at *8 (N.D. Cal. Mar. 18, 2010) (stating that "California
12 courts have presumed irreparable harm when proprietary information is
13 misappropriated"); Lillge v. Verity, No. C 07-2748, 2007 WL 2900568,
14 at *7 (N.D. Cal. Oct. 2, 2007) (finding that the "risk of losing
15 established customers to defendants' . . . due to defendants' improper
16 use of plaintiff's proprietary information would obviously create a
17 lasting, irreparable harm").

### C.  Balance of Hardships

19  Plaintiffs also argue that the balance of equities tips in
20 their favor since they have "a vital interest in protecting [their]
21 trade secret information and preventing competitors from using that
22 information" and "Bingham has no right to use [Plaintiffs']
23 proprietary information to his own benefit."  (Mem. of P. & A. in
24 Supp. of Mot. for TRO 10:27-11:3.)
25  The injunctive relief sought by Plaintiffs would prohibit
26 "Robert Bingham, his agents, servants, employees and attorneys, and
27 all those in active concert or participating with him . . . from
28 disclosing or using any and all trade secret, proprietary or

1  confidential information belonging to [Plaintiffs] . . . or known to
2  [Bingham] by virtue of [his] employment with [Plaintiffs], including
3  but not limited to all lists of, and information pertaining to,
4  [Plaintiffs'] customers, owners or members." (Proposed Order Granting
5  Pls.' Mot. for TRO ¶ 1.)  Therefore, "[t]he injunctive relief sought
6  by [Plaintiffs] is specific to the use of proprietary information
7  belonging to [Plaintiffs] . . . .  Accordingly, the balance of
8  hardships weighs in favor of [Plaintiffs]." TMX, 2010 WL 1028254, at
9  *8; see also Merrill Lynch, Pierce Fenner & Smith Inc v. Chung, No. CV
10 01-00659 CBM RCX, 2001 WL 283083, at *6 (C.D. Cal. Feb. 2, 2001)
11 (stating that "the balance of hardships tips heavily in favor of
12 granting injunctive relief because an injunction merely prohibits
13 Defendants from misappropriating the trade secrets of [Plaintiff]").

### D. The Public Interest

15 Plaintiffs also argue that injunctive relief "will not
16 adversely affect the public interest" since "[t]here is no legitimate
17 public interest in the unauthorized disclosure of a party's
18 proprietary business information." (Mem. of P. & A. in Supp. of Mot.
19 for TRO 11:5-11.)  Since "it is in the public interest that trade
20 secret customer lists be protected," Plaintiffs have shown that the
21 public interest favors injunctive relief in this case. Gable-Leigh,
22 2001 WL 521695, at *20 (citing Kewanee Oil Co. v. Bicron Corp., 416
23 U.S. 470 (1974), which states "[i]t is hard to see how the public
24 would be benefitted by disclosure of customer lists"); see also Chung,
25 2001 WL 283083, at *6 (holding that injunction that protects "trade
26 secret client lists and other confidential and trade secret
27 information" promotes the public interest).

### E. Bond

Federal Rule of Civil Procedure 65(c) ("Rule 65(c)") provides that "[t]he court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court's order granting Plaintiffs' motion for a TRO required that Plaintiffs file a bond in the amount of $10,000; the TRO was not effective until this bond was filed. Plaintiffs filed notice on July 1, 2010 that they had secured a bond in the amount of $10,000. Therefore, the requirements of Rule 65(c) are satisfied.

### IV.  CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction is GRANTED. Robert Bingham, his agents, servants, employees and attorneys, and all those in active concert or participating with him, is hereby prohibited from disclosing or using any and all trade secret, proprietary or confidential information belonging to plaintiffs Wyndham Resort Development Corporation dba WorldMark by Wyndham and Wyndham Vacation Resorts, Inc. or known to him by virtue of his employment with Wyndham, including by not limited to all lists of, and information pertaining to, Wyndham's customers, owners or members.

Dated:  July 8, 2010

GARLAND E. BURRELL, JR.
United States District Judge