IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WYNDHAM RESORT DEVELOPMENT CORPORATION and WYNDHAM VACATION RESORTS, INC., | )<br>)<br>)  2:10-cv-01556-GEB-KJM<br>) |
| Plaintiffs, | )  <u>ORDER GRANTING PLAINTIFFS'</u> |
| | )  <u>MOTION FOR A PRELIMINARY</u> |
| v. | )  <u>INJUNCTION</u> |
| | ) |
| ROBERT BINGHAM, | ) |
| | ) |
| Defendant. | ) |

Plaintiffs Wyndham Resort Development Corporation ("WRDC") and Wyndham Vacation Resorts, Inc. ("WVR") (collectively, "Wyndham") filed a motion for a temporary restraining order ("TRO") on June 22, 2010, seeking to enjoin Defendant Robert Bingham from "disclosing or using any and all trade secret, proprietary or confidential information belonging to Wyndham[,] . . . including but not limited to all lists, of, and information pertaining to, Wyndham's customers, owners or members." (Not. of Mot. for TRO 1:25-2:2.)  On June 22, 2010, a briefing schedule issued and a hearing was set for June 28, 2010 at 1:30 p.m.  However, after Bingham failed to file any response, the hearing was vacated, Plaintiffs' motion for a TRO was granted, and

1  a hearing and briefing schedule on Plaintiffs' request for a
2  preliminary injunction issued.[1]  Defendant was required to file an
3  opposition no later than June 30, 2010 at 4:30 p.m.  However,
4  Defendant again did not file any response.

5         A tentative ruling granting Plaintiffs' motion for a
6  preliminary injunction issued the morning of July 8, 2010, prior to
7  the preliminary injunction hearing scheduled to commence at 1:30 p.m.
8  on the same day.  At the July 8 hearing, Margaret Toldeo appeared on
9  behalf of Plaintiffs and Defendant Robert Bingham appeared *pro se*.
10 Bingham stated at the hearing that he did not oppose the adoption of
11 the Court's tentative ruling.  For the following reasons, Plaintiffs'
12 request for a preliminary injunction is GRANTED.

13                        **I.  LEGAL STANDARD**

14        The purpose of a preliminary injunction is to preserve the
15 relative positions of the parties - the status quo - until a trial on
16 the merits can be conducted.  LGS Architects, Inc. v. Concordia Homes
17 of Nev., 434 F.3d 1150, 1158 (9th Cir. 2006) (quoting Univ. of Tex. v.
18 Camenisch, 451 U.S. 390, 395 (1981)).  A plaintiff seeking a
19 preliminary injunction must establish that he is (1) "likely to
20 succeed on the merits"; (2) "likely to suffer irreparable harm in the
21 absence of preliminary relief"; (3) "the balance of equities tips in
22 his favor"; and (4) "a preliminary injunction is in the public
23 interest." Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir.
24 2009) (citing Winter v. Natural Res. Def. Council, Inc., --- U.S. ----

25 _____
26        [1]   Plaintiffs' motion appears to seek only a TRO.  However, the
   proposed order filed by Plaintiffs requested that a hearing be set to
27 hear their motion for a preliminary injunction yet did not provide that
   Plaintiffs would file an additional brief.  Accordingly, Plaintiffs'
28 motion for a TRO is construed as also seeking preliminary injunctive
   relief.

, ----, 129 S. Ct. 365, 374, 172 L.Ed 2.d 249 (2008)); <u>see also</u> <u>Am.</u>
<u>Trucking Ass'ns, Inc. v. City of Los Angeles</u>, 559 F.3d 1046, 1052 (9th
Cir. 2009) (adopting the preliminary injunction standard articulated
in <u>Winter</u>).  A preliminary injunction is "an extraordinary remedy that
may only be awarded upon a clear showing that the plaintiff is
entitled to such relief." <u>Winter</u>, 129 S. Ct. at 376.  "If a plaintiff
fails to meet its burden on any of the four requirements for
injunctive relief, its request must be denied." <u>Sierra Forest Legacy</u>
<u>v. Rey</u>, --- F. Supp. 2d ----, 2010 WL 715846, at *1 (E.D. Cal. 2010)
(citing <u>Winter</u>, 129 S. Ct. at 376).  "In each case, courts must
balance the competing claims of injury and must consider the effect on
each party of the granting or withholding of the requested relief."
<u>Indep. Living Ctr. of S. Cal. Inc. v. Maxwell-Jolly</u>, 572 F.3d 644, 651
(9th Cir. 2009) (quoting <u>Winter</u> 129 S. Ct. at 376).

## II.  BACKGROUND

### A.  Factual Background

Plaintiff WVR develops, finances, manages and sells
timeshare properties.  (Compl. ¶ 7.)  WVR's sister company, Plaintiff
WRDC, is the exclusive developer, marketer and management company of
WorldMark The Club ("WorldMark").  (Fry Decl. ¶ 3.)  Peggy Fry, the
Vice President of Owner Services for WRDC, describes WorldMark as
follows:

> WorldMark is a credit-based timeshare product that
> allows the owner to vacation within the WorldMark
> system of resorts.  WRDC does not sell deeded
> interests in property at a specific resort.
> Instead, WorldMark owners own points called
> "vacation credits" that they can use at 70
> WorldMark resorts in the United States, Hawaii,
> Canada, Mexico and Fiji.  The timeshare owners
> purchase an initial quantity of credits and in
> return they obtain a WorldMark The Club membership.
> Each year the WorldMark owners receive their annual

3

allocation of credits.  WorldMark owners have the opportunity to upgrade their memberships by purchasing additional credits.  By upgrading their memberships, WorldMark owners increase their annual allotment of credits which provides them with more access to the WorldMark resorts.

(Fry Decl. ¶ 3.)

WRDC has two sales forces.  (Peterson Decl. ¶ 3.)  "The 'frontline' sales force sells WorldMark memberships to prospects that are not current WorldMark members.  The 'upgrade' sales force sells upgrades to existing WorldMark members."  (<u>Id.</u>)  "The upgrades sales force directly competes with third-party brokers for upgrade sales.  Third-party brokers seek to sell discounted upgrades to current WorldMark members."  (<u>Id.</u> ¶ 5.)  The majority of WRDC's sales revenue is generated from upgrade sales.  (<u>Id.</u> ¶ 4.)  In 2009, WorldMark members purchased 13,257 upgrades from WRDC, accounting for approximately 61 percent of WRDC's total sales for that year.  (<u>Id.</u> ¶ 9.)

Bingham was employed by WRDC on four occasions from 1994 to 2009 and held various positions including sales representative, sales manager, and director of site sales.  (Haskew Decl. ¶ 3.)  Most recently, Bingham was employed from February 2009 until August 14, 2009 as a sales representative.  (<u>Id.</u>)  In this capacity, Bingham was responsible for selling upgrades to existing WorldMark members.  (<u>Id.</u> ¶ 4.)  Bingham's employment with Wyndham, however, was terminated on August 16, 2009.  (<u>Id.</u> ¶ 9.)

On April 15, 2010, Peggy Fry received an email from Dan Murphy, the President of Timeshare Liquidation Service, LLC, in which he wrote that "'a past Wyndham sales executive' tried to sell him 40,000 names of WorldMark owners."  (Fry Decl. ¶ 6.)  Fry requested

that Murphy tell her the name of the former sales executive;
initially, Murphy declined to reveal the former sales executive's
identity.  (Id. ¶ 7.)  Fry contacted Murphy on June 1, 2010, again
requesting that he disclose the name of the former sales executive.
(Id. ¶ 8.)  Murphy responded in an email, writing that he:

> was offered 40,000 [WorldMark] owners['] names,
> prequalified for Travel Share, from the N. CA
> office, by [WorldMark] Owner Robert Bingham,
> formerly owner of WM 00023005104.  He claimed to
> have worked for Trendwest/Wyndham for 17 years.  I
> declined, stating that [those] names belonged to
> Wyndham, not Bingham.  He concurred, and didn't
> press me.  I have no idea if he was successful
> selling them elsewhere, or if he even has them to
> begin with.

(Fry Decl. ¶ 6, Ex. A.)  At the July 8 hearing, Bingham admitted that
he had taken Plaintiffs' documents and had attempted unsuccessfully to
sell them on one occasion.

Prior to commencing his employment with Wyndham, Bingham
agreed in writing to abide by the Business Principles of WRDC's parent
Company, Wyndham Worldwide Corporation.  (Haskew Decl. ¶ 8.)  Wyndham
Worldwide Corporation's Business Principles identify "client lists,
(including phone numbers and postal and e-mail addresses) and/or
client or customer contact information" as "confidential and
proprietary information" that is the "sole property of Wyndham
Worldwide."  (Haskew Decl. ¶ 8, Ex. C at 12.)  The Business Principles
further provide that "[i]nformation relating to the company and its
subsidiaries and affiliates must be kept secure, used solely as
authorized by the Company and must not be given to unauthorized
outsiders or used for personal interest or profit."  (Id. at 13.)

1   Before beginning his employment with WRDC, Plaintiff also

2   signed a Salesperson Agreement on February 11, 2009, which states the

3   following:

4     <u>DISCLOSURE OF INFORMATION</u>.  Salesperson agrees and
  acknowledgment that, as an employee of WRDC,

5     Salesperson may be given or be privy to certain
  valuable, proprietary or confidential information,

6     including but not limited to . . . prospect or
  purchaser lists.  Except in the normal course of

7     Salesperson's duties hereunder, Salesperson shall
  not, while employed by WRDC or at anytime

8     thereafter, copy or disclose any such information
  to any person or entity for any reason or purpose,

9     nor shall Salesperson utilize such information.
  Salesperson agrees that all such information,

10    including any copies thereof, is the property of
  WRDC and that immediately upon termination of

11    Salesperson's employment with WRDC all such
  property and data, including any copies,

12    recordations (whether in written or electronic
  form) or abstracts thereof, shall be returned to

13    WRDC.  Because WRDC's damages from any violation of
  this paragraph would be impracticable and extremely

14    difficult to determine, the liquidated amount of
  damages presumed to be sustained from any such

15    breach will be $15,000.  That sum is agreed on as
  compensation for the injury suffered by WRDC, and

16    not as a penalty.  In addition, WRDC shall be
  entitled to injunctive relief as well as any remedy

17    available at law, including reasonable attorney's
  fees incurred in obtaining such relief.

18

19  (Haskew Decl. ¶¶ 7-8, Ex. A. ¶ 6.)

20    Further, upon his termination, Bingham was provided with a

21  severance agreement entitled "Agreement and General Release."  (<u>Id.</u> ¶

22  11.)  Paragraph 13 of the Agreement and General Release states:

23    BINGHAM acknowledges that in connection with
  his/her employment, BINGHAM has had access to

24    information of a nature not generally disclosed to
  the public.  BINGHAM agrees to keep confidential

25    and not disclose to anyone, unless legally
  compelled to do so, Confidential and Proprietary

26    Information.  "Confidential and Proprietary
  Information" includes but is not limited to all

27    Company or any Released Party's . . . current and
  prospective client and supplier lists . . . . Such

28    confidential information may or may not be

6

designated as confidential or proprietary and may
be oral, written or electronic media.  BINGHAM
understands that such information is owned and
shall continue to be owned by the Released Parties.
BINGHAM agrees that he/she has not and will not
disclose, directly or indirectly, in whole or in
part, any of the Confidential and Proprietary
information.  BINGHAM acknowledges that he/she has
complied and will continue to comply with this
commitment, both as an employee and after the
termination of his/her employment.  BINGHAM also
acknowledges his/her continuing obligations under
the Company Business Principles.

(Haskew Decl. ¶ 12, Ex. D.)  Plaintiff executed the Agreement and
General Release on April 16, 2010, approximately eight months after
his termination.

Dana Peterson, the Vice President of Upgrade Sales for
Wyndham Vacation Ownership, Inc. declares that "[t]he names and
contact information of WorldMark members is not publicly-available
because a WorldMark membership is not a deeded interest in a
timeshare."  (Peterson Decl. ¶ 5.)  Peterson further avers that "WRDC
spends a significant amount of time and resources developing and
maintaining its membership base" and that "WRDC's member lists are
trade secret and confidential and proprietary information [since they]
. . . provide WRDC with competitive advantages, or the opportunity to
gain competitive advantages, over those who do not have access to this
information."  (Id. ¶¶ 6-7.)

### B.  Procedural History

Plaintiffs filed a complaint against Bingham in this federal
court on June 21, 2010, alleging claims of trade secret
misappropriation, unfair competition under California Business and
Professions Code section 17200, breach of contract and intentional
interference with prospective economic advantage.  Plaintiffs moved

1  for a TRO on June 22, 2010; their motion was granted in a minute order

2  filed on June 25, 2010.  In accordance with the Court's minute order,

3  the TRO was effective on July 1, 2010 when Plaintiffs filed a notice

4  stating that they had secured a bond in the amount of $10,000.

5                          **III.  DISCUSSION**

6                  **A.  Likelihood of Success on the Merits**

7          Plaintiffs argue they are likely to succeed on the merits of

8  each of their four claims alleged against Bingham.

9  **i)   Trade Secret Misappropriation Claim**

10         Plaintiffs argue "Bingham's actions . . . constitute

11  misappropriation of Wyndham's trade secrets, specifically its list of

12  40,000 WorldMark owners."  Plaintiffs further argue that "[d]espite

13  having agreed on three separate occasions to maintain the

14  confidentiality of Wyndham's member information, Bingham offered to

15  provide the list to a competitor, Timeshare Liquidation Service, LLC,

16  which could have used that information to directly compete against

17  Wyndham in marketing upgrades to Wyndham's members."  (Mem. in P. & A.

18  in Supp. of Mot. for TRO 7:25-8:4.)

19         California has adopted the Uniform Trade Secrets Act

20  ("UTSA").  MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 520

21  (9th Cir. 1993) cert. denied, 510 U.S. 1033 (1993).  To prevail on

22  their trade secret misappropriation claim, Plaintiffs must satisfy

23  "two primary elements": "(1) the existence of a trade secret, and (2)

24  misappropriation of the trade secret." AccuImage Diagnostics Corp. v.

25  Terarecon, Inc., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (citing

26  Cal. Civ. Code § 3426.1(b)).

27                  **a.   Plaintiffs are Likely to Succeed in Establishing that
                            Their Customer List is a Protectable Trade Secret**

28

1   The UTSA defines a "trade secret" as "information, including

2   a formula, pattern, compilation, program, device, method, technique,

3   or process, that . . . [d]erives independent economic value, actual or

4   potential, from not being generally known to the public or to other

5   persons who can obtain economic value from its disclosure or use; and

6   . . . [i]s the subject of efforts that are reasonable under the

7   circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).

8   "It is well-established that a customer list may constitute

9   a protectable trade secret."  <u>Gable-Leigh, Inc. v. N. Am. Miss</u>, No. CV

10  01-01019 MMM (SHX), 2001 WL 521695, at *15 (C.D. Cal. Apr. 13, 2001)

11  (citations omitted); <u>see also</u> <u>Robert Half Int'l, Inc. v. Murray</u>, No.

12  CV F 07-0799 LJO SMS, 2008 WL 2625857, at *4 (E.D. Cal. June 25, 2008)

13  (stating "[a] customer list acquired by lengthy and expensive efforts

14  deserves protection as a trade secret") (citing <u>MAI Systems</u>, 991 F.2d

15  at 521 & <u>Courtesy Temporary Serv., Inc. v. Camacho</u>, 222 Cal. App. 3d

16  1278, 1288 (1990)).  In <u>Morlife, Inc. v. Perry</u>, 56 Cal. App. 4th 1514,

17  1521-22 (1997), the California Appellate Court explained the

18  circumstances under which a customer list is entitled to trade secret

19  protection:

20              [C]ourts are reluctant to protect customer lists to
            the  extent  they  embody  information  which  is
21          "readily available" through public sources, such as
            business directories.  On the other hand, where the
22          employer has expended time and effort identifying
            customers with particular needs or characteristics,
23          courts will prohibit former employees from using
            this information to capture a share of the market.
24          Such lists are to be distinguished from mere
            identities and locations of customers where anyone
25          could easily identify the entities as potential
            customers.   As  a  general  principle,  the  more
26          difficult information is to obtain, and the more
            time  and  resources  expended  by  an  employer  in
27          gathering it, the more likely a court will find
            such information constitutes a trade secret.  The
28          requirement that a customer list must have economic

9

> value to qualify as a trade secret has been interpreted to mean that the secrecy of this information provides a business with a "substantial business advantage."  In this respect, a customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested.  Its use enables the former employee to "solicit both more selectively and more effectively."

(internal citations omitted).

Plaintiffs have provided evidence that the identifies and contact information of WorldMark members is not publicly available and that their customer list has economic value "because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness" to purchase upgrades.  Morlife, 56 Cal. App. 4th at 1522 (citation omitted); (Peterson Decl. ¶¶ 5-7.)  Further, Plaintiffs have shown that they took measures reasonable under the circumstances to maintain the secrecy of their customer lists by requiring that sales staff undergo training as well as sign multiple agreements in which they acknowledge that WRDC's client lists and customer contact information are considered confidential and proprietary and the property of WRDC.  (Peterson Decl. ¶ 8.)  Plaintiffs, therefore, have shown that they are likely to succeed in establishing that their customer list constitutes a protectable trade secret under the UTSA.

**b.    Plaintiffs Are Likely To Succeed In Demonstrating That Bingham's Attempt to Sell Their Customer List Constitutes Threatened Misappropriation**

The UTSA defines "misappropriation" as:

> Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (A)  Used improper means to acquire knowledge of the trade secret; or

10

    (B)  At the time of disclosure or use, knew or had
         reason to know that his or her knowledge of
         the trade secret was:
         (i)   Derived from or through a person who had
               utilized improper means to acquire it;
         (ii)  Acquired under circumstances giving rise
               to a duty to maintain its secrecy or
               limits its use; or
         (iii) Derived from or through a person who owed
               a duty to the person seeking relief to
               maintain its secrecy or limit its use; or
    (C)  Before a material change of his or her
         position knew or had reason to know that it
         was a trade secret and that knowledge of it
         had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b).  "Actual or threatened misappropriation

may be enjoined."  Cal. Civ. Code § 3426.2(a); see also Cent. Valley

Gen. Hosp. v. Smith, 162 Cal. App. 4th 501, 524 (2008) (interpreting

California Civil Code section 3426.2(a) as providing "that an

injunction may be based either on actual misappropriation or on

threatened misappropriation").

     Bingham's attempt to sell Plaintiffs' customer list to one

of Plaintiffs' competitors constitutes threatened misappropriation

since Bingham attempted to disclose Plaintiffs' customer list when he

was contractually obligated maintain the confidentiality of such

information.  Plaintiffs, therefore, have shown that they are likely

to prevail on their claim that Bingham threatened to misappropriate

their trade secrets.

     Since Plaintiffs have shown a likelihood of success on their

trade secret misappropriation claim, their likelihood of success on

their other three claims need not be analyzed.

### B.  Likelihood of Irreparable Harm

     Plaintiffs also argue they will suffer irreparable harm if

Bingham is not restrained from disclosing their customer list.

Specifically, Plaintiffs argue that "Bingham's actions directly

threaten Wyndham with the loss of upgrade sales" as well as the

"ero[sion] [of] the good will between WRDC and its members."  (Mem. of

P. & A in Supp. of Mot. for TRO 10:13-14, 22-25.)

        Peggy Fry declares that "[a] large percentage of WRDC's

business is repeat business from WorldMark owners, including existing

owners' purchase of updgrade and owner referrals [and,] [t]herefore[,]

owner relations and goodwill are vital to WRDC's success."  (Fry Decl.

¶ 5.)  Fry further declares that WorldMark members "expect WRDC to

keep [their WorldMark membership] . . . confidential" and "[a]ny

disclosure of the names and contact information of WorldMark owners to

third-party brokers adversely affects the good will and trust of

WorldMark owners and consequently hurts WRDC's sales."  (Id.)  Lastly,

Fry declares that "[i]n recent months, the Owner Care department has

received an increasing number of complaints from WorldMark owners

regarding the owners being solicited by third-party timeshare

brokers."  (Id.)

        Plaintiffs, therefore, have shown that they are likely to

suffer irreparable harm in the absence of injunctive relief.  See

Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., Inc., 240 F.3d

832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective

customers or goodwill . . . supports a finding of the possibility of

irreparable harm."); see also Gallagher Benefit Servs., Inc. v. De La

Torre, 283 Fed. Appx. 543, 546 (9th Cir. Jun. 24, 2008) (affirming

district court's conclusion that injury to goodwill and customers due

to trade secret misappropriation constitutes irreparable harm); TMX

Funding, Inc. v. Impero Techs., Inc., No. C. 10-00202 JF (PVT), 2010

WL 1028254, at *8 (N.D. Cal. Mar. 18, 2010) (stating that "California

courts have presumed irreparable harm when proprietary information is

1   misappropriated"); <u>Lillge v. Verity</u>, No. C 07-2748, 2007 WL 2900568,

2   at *7 (N.D. Cal. Oct. 2, 2007) (finding that the "risk of losing

3   established customers to defendants' . . . due to defendants' improper

4   use of plaintiff's proprietary information would obviously create a

5   lasting, irreparable harm").

6   //

7                              **C.  Balance of Equities**

8            Plaintiffs also argue that the balance of equities tips in

9   their favor since they have "a vital interest in protecting [their]

10  trade secret information and preventing competitors from using that

11  information" and "Bingham has no right to use [Plaintiffs']

12  proprietary information to his own benefit."  (Mem. of P. & A. in

13  Supp. of Mot. for TRO 10:27-11:3.)

14           The injunctive relief sought by Plaintiffs would prohibit

15  "Robert Bingham, his agents, servants, employees and attorneys, and

16  all those in active concert or participating with him . . . from

17  disclosing or using any and all trade secret, proprietary or

18  confidential information belonging to [Plaintiffs] . . . or known to

19  [Bingham] by virtue of [his] employment with [Plaintiffs], including

20  but not limited to all lists of, and information pertaining to,

21  [Plaintiffs'] customers, owners or members."  (Proposed Order Granting

22  Pls.' Mot. for TRO ¶ 1.)  Therefore, "[t]he injunctive relief sought

23  by [Plaintiffs] is specific to the use of proprietary information

24  belonging to [Plaintiffs] . . . .  Accordingly, the balance of

25  hardships weighs in favor of [Plaintiffs]."  <u>TMX</u>, 2010 WL 1028254, at

26  *8; <u>see also</u> <u>Merrill Lynch, Pierce Fenner & Smith Inc v. Chung</u>, No. CV

27  01-00659 CBM RCX, 2001 WL 283083, at *6 (C.D. Cal. Feb. 2, 2001)

28  (stating that "the balance of hardships tips heavily in favor of

granting injunctive relief because an injunction merely prohibits
Defendants from misappropriating the trade secrets of [Plaintiff]").

### D.   The Public Interest

Plaintiffs also argue that injunctive relief "will not
adversely affect the public interest" since "[t]here is no legitimate
public interest in the unauthorized disclosure of a party's
proprietary business information."  (Mem. of P. & A. in Supp. of Mot.
for TRO 11:5-11.)  Since "it is in the public interest that trade
secret customer lists be protected," Plaintiffs have shown that the
public interest favors injunctive relief in this case.  Gable-Leigh,
2001 WL 521695, at *20 (citing Kewanee Oil Co. v. Bicron Corp., 416
U.S. 470 (1974), which states "[i]t is hard to see how the public
would be benefitted by disclosure of customer lists"); see also Chung,
2001 WL 283083, at *6 (holding that injunction that protects "trade
secret client lists and other confidential and trade secret
information" promotes the public interest).

### E.   Security

Federal Rule of Civil Procedure 65(c) ("Rule 65(c)")
provides that "[t]he court may issue a preliminary injunction or
temporary restraining order only if the movant gives security in an
amount that the court considers proper to pay the costs and damages
sustained by any party found to have been wrongfully enjoined or
restrained."  Fed. R. Civ. P. 65(c).  The Court's order granting
Plaintiffs' motion for a TRO required that Plaintiffs file a bond in
the amount of $10,000; the TRO was not effective until this bond was
filed.  Plaintiffs filed notice on July 1, 2010 that they had secured
a bond in the amount of $10,000.  Therefore, the requirements of Rule
65(c) are satisfied.

### IV.   CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction is GRANTED.  Robert Bingham, his agents, servants, employees and attorneys, and all those in active concert or participating with him, are hereby prohibited from disclosing or using any and all trade secret, proprietary or confidential information belonging to plaintiffs Wyndham Resort Development Corporation dba WorldMark by Wyndham and Wyndham Vacation Resorts, Inc. or known to Bingham by virtue of his employment with Wyndham, including by not limited to all lists of, and information pertaining to, Wyndham's customers, owners or members.

The Clerk of the Court shall mail a copy of this order to *pro se* Defendant Robert Bingham at 6836 Bender Court, Sacramento, California 95820, the address at which Plaintiffs have successfully served Bingham during the pendency of this action.  If Plaintiffs opine that this order should be mailed to a different address to provide Bingham with notice, that address shall be filed as soon as feasible.

Dated:  July 8, 2010

_____
GARLAND E. BURRELL, JR.
United States District Judge